## DETERMINED IN

# THE SUPREME COURT

### OF THE

# STATE OF CALIFORNIA.

[No. 13272. In Bank. — December 10, 1890.]

## In the Matter of the Estate of WILLIAM G. OSBORN, Deceased.

ESTATES OF DECEDENTS—TURNING OVER ASSETS TO CO-EXECUTOR—LIABILITY OF EXECUTOR—REASONABLE PRUDENCE. — An executor who has money of the estate in his hands, and turns it over to his co-executor, or who actively assists to put it into the hands of his co-executor, is liable for any misapplication of it by the latter, unless it appears that good reasons existed for turning it over, and that in allowing the co-executor to keep, control, and disburse it he acted in good faith, without notice of any purpose to misapply it, and with reasonable prudence and discretion.

ID. — GOOD FAITH OF PARTIES — OMITTED DUTY — HONESTY OF CO-EXECUTOR. — The liability of an executor for misappropriation of assets turned over to his co-executor depends on the circumstances of each case; good faith alone will not save him from liability, if an omitted duty on his part has occasioned the loss, nor will bad faith on the part of the co-executor subject him to liability, if he has omitted no duty on his part, since he has a right to rely upon the honesty of his co-executor, whether he be rich or poor.

ID. — NEGLECT OCCASIONING LOSS. — An executor or trustee is liable for the wrongful acts of a co-executor or co-trustee, to which he consented, or which by his negligence he enabled the latter to commit, and which he failed to use the means within his power to prevent.

ID. — DUTY OF EXECUTORS TO ACCOUNT — WASTE RESULTING FROM NEGLECT — JOINT AND SEVERAL LIABILITY. — It is the duty of executors to account within reasonable or statutory time, and a neglect to account which results in waste renders the executors jointly and severally liable, the same as in case of failure to collect debts before the statute of limitations has run against them.

LXXXVII. CAL.—1

ID. — EXECUTOR LEAVING STATE — INSOLVENCY OF CO-EXECUTOR — FINAL
    ACCOUNT AFTER STATUTORY TIME — LIABILITY FOR MISAPPROPRIATION.
    — An executor who upon departing from the state for an indefinite
    period left the money and business of the estate in the care of his co-
    executor, and thereafter took no part in its management, but joined in
    a final account with the co-executor long after the time allowed by
    statute for the filing of the account, is liable, upon the insolvency of
    the co-executor, for the funds appropriated by him to his own use.

APPEAL from an order of the Superior Court of the city and county of San Francisco settling the accounts of executors.

The facts are stated in the opinion of the court.

*Cope, Boyd & Fifield,* for Appellant.

*Selden S. & George T. Wright,* for Respondents.

PATERSON, J. — Edmond Saul and the appellant, William E. Straut, were appointed executors of the will of William G. Osborn, and entered upon the discharge of their duties October 28, 1867. The value of the estate for which they accounted was $32,667.20. Claims were presented, amounting in all to only $1,560.74. Nearly all of the heirs and devisees were non-residents, and constituted Hon. Seth M. Richmond, of New York, their attorney in fact, with authority " to collect, receive, sue for, demand, and give acquittances for all legacies, moneys, and property due and payable from the executors and trustees of the estate, and to make and execute full and ample receipts therefor." In February, 1868, Mr. Richmond came to this state, and it was determined by the executors, with his concurrence, to sell beach and water lot No. 588. It was sold for the sum of twenty-three thousand five hundred dollars, ten thousand dollars cash and the remainder on mortgage. The mortgage was assigned to Mr. Richmond, and there was paid to him the sum of fifteen hundred dollars, leaving eight thousand five hundred dollars of the purcha·e-money received in the hands of the executors. Each executor

deposited one half of that sum — $4,250 — to his credit
in the Hibernia Savings Bank, receiving a pass-book
therefor.   Appellant, having been called East on busi-
ness, delivered his pass-book, containing his account with
the Hibernia bank, to his co-executor, and transferred
the account to him.   Saul drew out the moneys de-
posited in Straut's name prior to September 1, 1868, and
thereafter had the deposit entered in his own book.
Richmond was aware of Straut's intention to leave the
money and business of the estate in the care of Saul,
and made no objection thereto.   No account was filed
until September 3, 1872, and no proceedings were ever
taken for its settlement by the executors.   No other ac-
count or exhibit was filed in the probate or superior
courts until 1886, when the executors were, under a cita-
tion directed to them, ordered to file a final account of
their administration.   Straut only was served, Saul be-
ing absent from the state.   Appellant filed an account
on the twenty-seventh day of October, 1886, showing
that the only moneys of the estate received by him was
said sum of $4,250, deposited in the Hibernia bank, and
subsequently turned over to his co-executor, and the
further sum of $650, received by appellant in March, and
immediately remitted to the attorney for the heirs.

From the time of the issuance of letters to the execu-
tors until the sale of beach lot 588, appellant had taken
no active part in the management of the estate, — had
not received or distributed any of its property.   All col-
lections made subsequent to the sale of that lot were
made by Saul.   Straut was absent from the state from
March to October, 1868.   During all that time Saul was
in business for himself, in good standing and credit in
the community.   At the time the account was filed, in
1872, appellant knew that there was a shortage in the
account of his co-executor, and contributed about $2,500
to make it up, believing himself to be liable for one half
of the shortage.   When the account of 1872 was rendered,

there was in Saul's hands, belonging to the estate, the sum of $3,714.43, of which $3,066 was collected subsequent to January 1, 1869. Appellant took no part in the management of the estate after his return from the East, in 1868. Saul became insolvent, but the precise time of his insolvency is not shown by the evidence. Appellant states, in his testimony, that he does not know what was the financial condition of Saul at the time the account of 1872 was filed, but he thinks he was then in business for himself; that Saul left this state about seven or eight years ago, and when last heard from was living in Mexico.

The court below held that the appellant was indebted to the estate, as executor, in the sum of $3,716.70, less the sum of $1,000, allowed him as commissions. In view of the fact that there was no intentional wrong on the part of Mr. Straut, the court did not allow interest on the principal sum found to be due the estate.

An executor who has money of the estate in his hands, and turns it over to his co-executor, or who actively assists to put it into the hands of his co-executor, is generally liable for any misapplication of it by the latter. There are exceptions to this general rule; but to avoid liability in such cases, it must appear that good reasons existed for turning over the money to the co-executor, and that in allowing him to keep, control, and disburse it he acted in good faith, without notice of any purpose to misapply it, and with reasonable prudence and discretion. In *Estate of Sanderson*, 74 Cal. 213, the court said: " It has sometimes been broadly stated that if an executor turn over assets which he has received to his co-executor, he becomes responsible for the due application and administration of those assets by his co-executor." There are cases which go to that extent. (*Crosse* v. *Smith*, 7 East, 246; *Douglass* v. *Satterlee*, 11 Johns. 16; *Edmonds* v. *Crenshaw*, 14 Pet. 166.) But this is not a universal rule; there may be circumstances which would render it

not only appropriate, but necessary, to make such a transfer of the assets of an estate by an executor to his co-executor in good circumstances and credit: such as inability to act, by reason of sickness or imprisonment. (*Sterrett's Appeal*, 2 Penr. & W. 419.) The liability of the executor who has thus intrusted to his co-executor the fund for which he was himself primarily responsible, depends upon the circumstances of each case; good faith alone will not save him from liability, nor will bad faith on the part of his co-executor subject him to it.

If good reason existed for turning over the money to his co-executor, and if, in allowing him to keep, control, and disburse it, he acted in good faith, and with reasonable care and prudence, so that it cannot be said those who are entitled to receive it have lost it through his fault or negligence, he will not be held responsible. A wrongful act or omitted duty lies at the foundation of his liability. He has the right to assume, in all cases, that his co-executor is an honest man. The testator by his appointment recommended him as such, and the fact that he is insolvent should create no suspicion upon which to base a want of confidence. An honest executor who is poor is as worthy of confidence and trust as an honest executor who is rich. (*McKim* v. *Aulbach*, 130 Mass. 484; 39 Am. Rep. 470; *Wilson's Appeal*, 115 Pa. St. 101; *Peter* v. *Beverly*, 10 Pet. 534; *Ormiston* v. *Olcott*, 84 N. Y. 346; *Langford* v. *Gascoyne*, 11 Ves. 333.) But where the estate or part of it has been lost through the failure of the executors to perform some duty required of them by the trust, such as to collect debts before the statute of limitations has barred action thereon, to preserve the estate, to prevent waste, etc., they are liable, jointly and severally.

In *Estate of Sanderson*, 74 Cal. 213, the court said: "The obligations of co-executors arise from their contract, and are several. Although one may in some cases make himself liable by placing the other in a position to

do wrong, or by aiding him in his acts of misfeasance, the liability is still the several liability of each. And this is so even if it be conceded the devisees or legatees may under some circumstances claim both to be liable. . . . . If an executor stands by and sees a breach of trust committed, or about to be committed, by a co-executor, and does nothing to protect the estate, or to call the defaulting executor to account, he is liable. . . . . When an executor is guilty of neglect with reference to assets in the possession of his co-executor, he is not made liable upon the theory that the assets are in the possession of both,—which in fact they are not,—but upon his neglect in delivering them to his co-executor without good cause, or in not seeing to it that they were taken out of the possession of the co-executor, or were not by him misapplied or lost."

This decision is in line with current authority, and with the provisions of the code. Section 2239 of the Civil Code provides that "a trustee is responsible for the wrongful acts of a co-trustee to which he consented, or which, by his negligence, he enabled the latter to commit, but for no others." (See also Story's Eq. Pl., sec. 1284, note; *Croft* v. *Williams*, 88 N. Y. 384; *Lincoln* v. *Wright*, 4 Beav. 427; *Weigand's Appeal*, 28 Pa. St. 471.)

Applying these principles to the case at bar, we find no way to escape the conclusion that appellant was properly charged with the balance found by the court to be due from the executors on March 17, 1871, less commissions.

There is no doubt that Mr. Straut acted in the utmost good faith in all matters connected with the estate, and that he is a man of high character and excellent repute. There has been no intentional neglect of duty, and it is a matter of regret that his inadvertence, over-confidence, and good nature have brought upon him this loss; but we are not authorized by the hardship of this particular case to depart from well-settled principles, and establish

a precedent which would open an avenue of waste, fraud, and peculation in the management of estates, and for which the guilty parties could not be held accountable.

We cannot say that Mr. Straut was wrong or negligent in placing the money in the hands of his co-executor. He was about to leave the state for an indefinite period. The journey had to be made by sea and land, and was a perilous one. There was nothing to create a suspicion that Saul might misapply the money left with him. There were few claims against the estate, which was one that could have been and ought to have been speedily administered and distributed. Nor was there anything wrong in allowing Saul to manage the estate. Straut had the right to act alone, or not at all, as he chose. He could have renounced the trust entirely,—it is unfortunate for him that he did not do so; but in acting with Saul he made the latter's acts his own, and is bound by them. The delay in the filing of accounts and settlement of the estate was a direct violation of a statutory duty. The executors were required to file an exhibit, under oath, showing the amount of money received and expended by them, the amount of all claims presented, names of the claimants, and all other matters necessary to show the condition of the estate, and to render full account within thirty days after the expiration of the time mentioned in the notice to creditors. Instead of filing an account showing the amount of money received by him, and what had become of it, as he had a right to do to protect himself, and as required by law, Mr. Straut chose to allow four years to elapse without any showing by himself or his co-executor, and then joined in an account with his co-executor, which he adopted as his own, and prayed for its settlement. There is nothing upon the face of the report to show that he had received only the amount of money referred to,—$4,250,—or that he had turned it over to his co-executor. If the facts had been made to appear in that account, the devisees would

have had something to put them upon their guard. Appellant's neglect through a period of nearly twenty years to report to the court his own transactions with respect to the property of the estate was itself negligence, and, taken in connection with the report made by himself and his co-executor, wherein it was made to appear that they had received all the moneys therein accounted for jointly, is sufficient, we think, to render him liable. The court below evidently believed that the loss would not have been sustained if the appellant had exercised reasonable diligence and care in the performance of his duty as executor, and for that reason held him chargeable with the deficiency; and we cannot say that the court erred. In *Adair* v. *Brimmer*, 74 N. Y. 566, the court held that where an executor through his negligence suffered his co-executor to receive and waste the estate, when he had the means of preventing it by proper care, he was liable to the beneficiaries for the waste. In *Thompson* v. *Finch*, 22 Beav. 316, an executor was held liable for failure to see that money was properly invested, although he had been informed by his co-executor that it had been properly invested. The executor in that case allowed a period of ten years to pass without ascertaining what the co-executor had done with the funds, and for such negligence was held liable, although no improper motive was attributed to him. It has been held in a great many cases that it is the duty of executors to account within reasonable or statutory time, and a neglect to account which results in waste renders the executor liable, the same as in case of failure to collect debts, before the statute of limitations has run against them. (*Styles* v. *Guy*, 1 Macn. & G. 434; *Southerland* v. *Brush*, 7 Johns. Ch. 17.) By joining his co-executor in the account of 1872, appellant admitted the joint liability of the executors for the balance then in their hands. If the account had been settled by the court as prayed for by them therein, the order of the court would have been

an adjudication of their joint liability. (*Ducommun's Appeal,* 17 Pa. St. 268; *Haage's Appeal,* 17 Pa. St. 190; *Hengst's Appeal,* 24 Pa. St. 420.)

The fact that the money and the sole management of the estate were given into the hands of Saul with the concurrence of Mr. Richmond is immaterial. (*Edmonds v. Crenshaw,* 14 Pet. 166.) Mr. Richmond's power of attorney authorized him only to collect moneys due nonresident beneficiaries, and gave him no authority to direct the management of the estate, or to waive any of the rights of those whom he represented.

The court found that the sum of $3,060 of the balance due from the executors was collected by Saul subsequent to January 1, 1869. From this finding it is apparent that only $654.43 could have been money which appellant turned over to Saul, and as he is entitled to a credit of $1,000 commissions, as executor, he claims that the judgment should have been in his favor.

It is true, said amount of $3,060 of the money turned over by him to Saul was actually and regularly disbursed by the latter in payment of claims and legacies, and if appellant had reported correctly and within reasonable time his transactions, so as to show the court and beneficiaries the limit of his responsibility, he would have been protected. Instead of doing this, however, under a mistaken idea as to his liability, and through fear "that if the matter were exposed in the courts it might seriously affect his credit and the credit of his firm," he failed to disclose the fact that " he, Saul, was not doing right," and that "there was a shortage," borrowed $2,250, which was one half of the amount then due the legatees, and sent it to Mr. Richmond in satisfaction, as he believed, of all claims against him on account of the default of his co-executor. Subsequently, Saul prepared an account showing a balance due to the estate of $3,622.79. Appellant examined the account, and it was signed and filed as the joint account of the two execu-

tors. Upon its face it appeared that the executors had acted jointly in the receipt and disbursement of all the property of the estate, and retained a balance of $3,622.79, including commissions. Here is where appellant made his greatest mistake. The law required prompt reports from both. Instead of reporting his own transactions, and permitting or requiring his co-executor to do likewise, which would have put all concerned upon notice of the several liabilities of each executor, he joined in an account which represented him to be jointly responsible with Saul, although he knew that Saul "was not doing right," and allowed it to slumber on the records for over sixteen years, without any effort to correct it or have it settled. In the mean time his co-executor became insolvent, and left the country, and is now, together with his property, if he has any, beyond this jurisdiction. When appellant discovered that there was a shortage, that his co-executor was not doing right, and was in failing circumstances, it was his duty to the beneficiaries and to himself to report the facts to the court, and procure a settlement of the account; this would have determined the liability of each, and put all concerned upon their guard. The exact time when Saul became insolvent is not shown, but appellant testifies that he was in business some time after the account was filed, but that " his reputation was not as good after that time as it was before."

It is an unfortunate case; but upon all the authorities, and upon principle, we must hold the executor responsible when it is so apparent that only his own negligence and mistaken idea as to his liability have occasioned the loss. It would never do to permit an executor to appear to be acting and sharing in the responsibility with his co-executor, join in reports of what they have done jointly, and, many years afterwards, when the co-executor is bankrupt, and out of the jurisdiction of the court, allow him to contradict the reports rendered, and avoid responsi-

bility by showing that as a matter of fact he has done none, or only a part, of the things reported.  There is but one safe course for one named as executor to pursue: either renounce the nomination and refuse to qualify, or make prompt and correct reports and accounts of his transactions as executor, and have them settled.

The order is affirmed.

Fox, J., McFarland, J., Works, J., Sharpstein, J., and Beatty, C. J., concurred.